## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **WILLIAM H. DAWES, JR.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case 2:23-cv-02005-EFM** |
| | ) | |
| **STATE OF KANSAS** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff hereby submits his Suggestions in Opposition to Defendant's Motion for Summary Judgment. The Kansas Highway Patrol alleges that Plaintiff was fired for not answering interview questions during an administrative investigation on Monday, June 13, 2022. Plaintiff was fired because he is transgender. Defendant's stated reason for the termination was pretextual. Defendant's Motion for Summary Judgment should be denied. There are genuine issues of material fact that are in dispute which are questions a jury is entitled to decide.

**I.     Plaintiff's Response to Defendant's Statement of Facts**

1.  Dawes worked for the KHP as a civilian employee assigned to General Headquarters, located in Topeka, KS. Dawes was a Public Service Admin II assigned to facilities management in the Fiscal Services section from March 8, 2021, until June 7, 2022. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶¶ i, ii.

<u>Response</u>:     Not controverted.

2.  Dawes voluntarily disclosed his status as a transgender individual to three KHP staff during his employment. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ vii. These persons were:

1

Shellbie Blodgett, KHP's Director of Human Resources, (id., at ¶ viii); Sandy Crowell, a co-worker, (Exhibit 2, Dawes dep., 14:20 – 15:7); and Sherry Macke, Dawes' direct supervisor. (Id., at 16:6-17:7; 18:5-20; 19:9-18).

Response:        Not controverted.

3.   Dawes initiated a meeting with HR Director Blodgett to discuss the process for Dawes to transfer from a male to a female identity at work. Id., 20:13-21:2.

Response:        Not controverted.

4.   Dawes believed the disclosures were made in confidence. Exhibit 2, Dawes dep., 16:1-3; 21:14-22.

Response:        Not controverted.

5.   However, following Dawes's disclosure, Macke contacted her supervisor, Maj. Eric Sauer. Maj. Sauer alerted KHP Col. Herman Jones, and a meeting was arranged with Col. Jones, Assistant Superintendent Jason DeVore, KHP's General Counsel Luther Gaineany, HR Director Blodgett, and Maj. Sauer. The attendees discussed Dawes' planned transition and KHP's responsibilities in accommodating Dawes through the process in an effort to ensure KHP's preparedness. Exhibit 5, Jones dep., 17:16-18:25; 19:4-23. The participants elected to seek advice and additional information relating to training from the Kansas Department of Administration. Id.

Response:        Not controverted that Col. Herman Jones stated this in his deposition. This is a post-hoc fabrication. There is no documentation of this meeting, no documentation regarding the request to another department, nor any documentation as to what was discussed in this meeting. (Plaintiff's Statement of Facts # 9, 10). There are no listings on Defendant's privilege log noting any documents withheld in this time period with the meeting participants listed. (Plaintiff's Statement of Facts #9, 10; Ex. D, Privilege Log).

2

6.   Dawes remained unaware this meeting occurred until after the lawsuit commenced. Exhibit 2, Dawes dep., 21:13-22.

<u>Response</u>:      Not controverted. There is no documentation of this meeting, no documentation regarding the request to another department, nor any documentation as to what was discussed in this meeting. (Plaintiff's Statement of Facts # 9, 10).

7.   At 1:53 p.m. on June 6, 2022, Dawes emailed a female co-worker, C. K., because Dawes had noticed her while eating lunch. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ ix. The email said:

> Just a note to tell you that I think you look absolutely amazing today! I was eating my lunch in the lobby of Jayhawk, and I just happened to glance out the window where I saw this amazing woman walking across the street…and it was you! Lol. I've told you this before, but you are truly a breath of fresh air! Please don't ever stop expressing yourself. It is beautiful for me to see a woman so comfortable expressing her femininity. I absolutely LOVE your heels, BTW…I'm jealous! (Please know that I'm honestly not flirting with you…although if I were 30 years younger, I might seriously consider that option, lol. I find you inspirational, and I wanted you to know.) You made my day. Thank you!

> Exhibit 3, June 6 Email.

<u>Response</u>:      Not controverted. K.K.[1] responded to this email to Plaintiff the same day at 7:04 p.m. by stating "Thank you!" (Ex. B). The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts # 40-42). The reason Plaintiff sent the email was that he was jealous that K.K. was a female and out there being herself and he was not able to do that as a transgender person. (Ex. 2, Dawes Depo 29:16-30:14).

---

[1] Defendant has used the wrong initials for the female co-worker - her initials are K.K. Out of courtesy, Plaintiff has redacted K.K.'s identity even though Exhibit B is not confidential, was not produced by Defendant, and not covered by the parties' protective order.

Defendant did not attach the investigation report or the June 16, 2022 video of Plaintiff's full and complete interview because it is not relevant.

8.   After having second thoughts about sending the email, Dawes walked from Dawes' office across the street to C.K's office to discuss the email with her. Exhibit 2, Dawes dep., 25:25-26:24.

Response:      Not controverted. The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts # 40-42).

9.   Dawes returned to Dawes' office without talking to C.K. because she was engaged in conversation with a co-worker. Id., 27:3-16; 28:8-12.

Response:      Not controverted. The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts # 40-42).

10.   Documentation reflects that, on June 6, 2022 at 2:59 p.m., C.K. reported the email and Dawes's visit to supervisor Cpt. Mitchell Clark and stated she felt uncomfortable and interpreted Dawes's comments as unwelcome sexual advances. Exhibit 3, June 6 Email; Exhibit 4, Harassment Report.

Response:      Not Controverted. The documentation also reflects that:

> K.K. declined to file a formal complaint. Instead she requested Bill Dawes' immediate supervisor speak to him about his inappropriate behavior and how uncomfortable she is with him. Furthermore, she insists he not have any contact with her.

The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts # 40-42).

11.  The documentation reflects that C.K. also reported an additional encounter with Dawes approximately one month earlier when Dawes said he "appreciated a woman wearing heels and panty hose, and how nice it was to see a female really taking care of herself." Exhibit 4, Harassment Report. C.K. stated she felt the comments were very strange because she had not previously spoken with Dawes. Id.

Response:      Not Controverted. The documentation also reflects that:

> K.K. declined to file a formal complaint. Instead she requested Bill Dawes' immediate supervisor speak to him about his inappropriate behavior and how uncomfortable she is with him. Furthermore, she insists he not have any contact with her.

The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts #40-42).

12.  The documentation reflects Captain Clark reported C.K's account to his supervisor, Major Eric Sauer, and HR Director Blodgett. Exhibit 4, Harassment Report.

Response:      Not controverted.

13.  Major Sauer related the events to Col. Jones. Exhibit 5, Jones dep., 6:25-7:9; 13:24-14:16.

Response:      Not controverted.

14.   On June 7, 2022, Col. Jones assigned the Professional Standards Unit ("PSU") to conduct an administrative investigation into allegations of harassment reported by C.K. involving Dawes that occurred on June 6, 2022. Id., 15:11-16. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ x.

Response:     Not controverted.

15.   PSU Captain Dan DiLoreto was assigned to investigate the report of harassment. Exhibit 6, DiLoreto dep., 12:4-14. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xi.

Response:     Not controverted.

16.   Dawes was aware of—and agreed to abide by—KHP's policies and procedures. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ v; Exhibit 2, Dawes dep., 32:12-32:23 (ROC-09), 35:17-36:9 (ADM-07).

Response:     Not controverted.

17.   KHP Policy ROC-09 prohibits harassment in the workplace. Exhibit 7, ROC-09.

Response:     Not controverted.

18.   KHP Policy AAA-02 prohibits sexual harassment in the workplace. Exhibit 8, AAA-02.

Response:     Not controverted.

19.   KHP Policy ADM-07 sets forth the procedure for reporting and investigating complaints submitted. Exhibit 5, Jones dep., 34:21-35:2; Exhibit 9, ADM-07.

Response:     Not controverted. ADM-07 does not list what, if any, discipline will happen if someone does not comply with an investigation. (Def. Ex. 5, Jones Depo 36:01-04; Plaintiff's Statement of Facts #11-12).

20.   Section V details the investigative process of a complaint. Exhibit 9, ADM-07, p. 5-9.

Response:      Not controverted. ADM-07 does not list what, if any, discipline will happen if someone does not comply with an investigation. (Def. Ex. 5, Jones Depo 36:01-04; Plaintiff's Statement of Facts #11-12).

21.   Policy ADM-07 requires the PSU to make every reasonable effort to complete an administrative investigation within 45 calendar days. Exhibit 9, ADM-07, § V.O, p. 8.

Response:      Not controverted. ADM-07 does not list what, if any, discipline will happen if someone does not comply with an investigation. (Def. Ex. 5, Jones Depo 36:01-04; Plaintiff's Statement of Facts #11-12).

22.   Section V.I details an employee's obligations. It requires full cooperation with the PSU investigation, including a mandate to answer questions as directed, other than those intended to be self-incriminating. Exhibit 9, ADM-07, § V.I, pp. 6-7.

Response:      Not controverted that the employee's obligations are listed in ADM-07. The policy speaks for itself. There is no "mandate" noted in the section cited. ADM-07 does not list what, if any, discipline will happen if someone does not comply with an investigation. (Def. Ex. 5, Jones Depo 36:01-04; Plaintiff's Statement of Facts #11-12).

23.   On June 7, 2022, Dawes was placed on paid administrative leave with pay due to the sensitive nature of the investigation. Exhibit 5, Jones dep., 21:18-22:9; Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xii.

Response:      Not controverted that Plaintiff was placed on administrative leave. The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts # 40-42).

24.   On June 7, 20232, Lt. DiLoreto hand-delivered two letters to Dawes and provided the "Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities" notice. Exhibit 10, PSU Inv. Notice; Exhibit 11, EE's R&R; Exhibit 6, DiLoreto dep., 17:12-18:11; 18:14-18; Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xiii.

<u>Response</u>:      Not controverted.

25.   The Notice of the PSU investigation warned Dawes:

Per policy, you are directed to give your full cooperation in this matter. Remember, this is a confidential internal investigation requiring maintained confidentiality consistent with agency policy. Understand, you may be asked for statements and be subject to interviews regarding this investigation, and will receive notice, if necessary. As this is an agency administrative review, please remember to maintain confidentiality per policy, and not discuss this investigation to anyone than your attorney, association representative, or immediate family.

Exhibit 10, PSU Inv. Notice.

<u>Response</u>:      Not controverted. This document does not mention discipline, if any, that may result from a refusal to answer questions. (Plaintiff's Statement of Facts #13).

26.    The Employee Conduct Complaint Investigation: Employee's Rights and Responsibilities notice advised Dawes:

You are advised that this complaint will be investigated and that you may be asked to answer questions or submit to certain tests regarding these allegations in accordance with written policies and procedures of the agency, specifically Policy and Procedure ADM-07 titled "Complaint Reporting and Administrative Investigations."
…
During an administrative investigation you may be interviewed and/or directed to provide written reports concerning this incident. Any statements you are directed to make or any information you are directed to provide during an administrative investigation cannot be used against you in any subsequent criminal proceeding. Your refusal to provide these responses, or any untruthfulness in your responses, will be considered insubordination and may subject you to disciplinary action.

Exhibit 11, EE's R&R.

<u>Response</u>:       Not controverted. The document Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities given to Plaintiff on June 7, 2022, does not describe what disciplinary action would be taken and does not mention termination. (Def. Ex. 11; Def. Ex. 5, Jones Depo 25:13-16; Plaintiff's Statement of Facts #14-15).

27.   On June 9, 2022, Lt. DiLoreto instructed Dawes to report to the PSU Office on Monday, June 13 at 1:00 pm for an interview. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xiv. The letter ordered Dawes "You are to give your full cooperation in this matter" and informed Dawes a KOSE representative may also attend if Dawes desired. Exhibit 12, June 9 Ltr.

<u>Response</u>:       Not controverted that Plaintiff received this letter. The document speaks for itself. Controverted that the letter "ordered" Dawes to give full cooperation. The word "order" or "ordered" does not appear in the letter. The letter also states: "You may have representation if you so desire." (Plaintiff's Statement of Facts #18-19).

28.   On June 13, 2022 at or around 1:00 pm, Dawes arrived at the PSU Office. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xv.

<u>Response</u>:       Not controverted.

29.   Lt. DiLoreto provided Dawes the Garrity/Lefkowitz Warning and gave Dawes time to review the warning. Exhibit 17, June 13 Interview,1 0:00:23-0:00:59; Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xvi.

<u>Response</u>:       Not controverted. This was the first time Plaintiff had seen the document. (Plaintiff Statement of Facts #20; Def. Ex. 16).

30.   After Dawes reviewed the warning, Lt. DiLoreto further explained the Garrity/Lefkowitz Warning to Dawes and made clear the interview is compelled. Exhibit 17, June 13 Interview, 0:00:59-0:01:08.

<u>Response</u>:     Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

31.   Dawes acknowledged Dawes understood the requirement and stated, "you'll fire me if I don't talk to you, basically." Exhibit 16, Transcript of June 13 Interview; Exhibit 17, June 13 Interview, 0:01:09-0:01:12; Exhibit 2, Dawes dep., 37:13-37:13.

<u>Response</u>:     Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts # 20-24).

32.   Lt. DiLoreto confirmed Dawes' understanding and said "right," Exhibit 17, June 13 Interview, at 0:01:12, but supplemented "this [the Garrity/Lefkowitz Warning] doesn't say we will [fire you], this just lays out consequences for not participating." Id., at 0:01:20-24; Exhibit 16, Transcript of June 13 Interview.

<u>Response</u>:     Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

33.   Although Dawes stated, "it certainly implies you will [fire me]." Exhibit 16, Transcript of June 13 Interview; Exhibit 17, June 13 Interview, at 0:01:20-0:01:24, Dawes refused to sign the Garrity/Lefkowitz Warning. Id.; Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xviii.

10

Response:      Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

34.   Lt. DiLoreto confirmed he would not force Dawes to sign the Garrity/Lefkowitz Warning but reaffirmed Dawes's refusal to answer any interview questions. Exhibit 16, Transcript of June 13 Interview; Exhibit 17, June 13 Interview, at 0:01:24 - 0:01:38.

Response:      Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

35.   Dawes refused to participate in the interview on June 13, 2022. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xvii.

Response:      Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

36.   Dawes did not request the interview be postponed; Dawes stated Dawes "can't" do the interview because Dawes was not prepared. Exhibit 16, Transcript of June 13 Interview; Exhibit 17, June 13 Interview, at 0:01:38 - 0:02:16.

Response:      Not controverted that Plaintiff did not use the term "postpone." The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). However, Plaintiff asked about speaking with an attorney multiple times and in context his

intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

37.   Lt. DiLoreto warned Dawes that there may not be a future opportunity to be interviewed; Dawes replied, "that's fine." Exhibit 16, Transcript of June 13 Interview; Exhibit 17, June 13 Interview, at 0:03:39-0:04:13.

Response:      Not controverted. The full interview and full transcript speak for themselves. (Def. Ex. 16, Interview Transcript; Def. Ex. 17, Interview Video). Plaintiff asked about speaking with an attorney multiple times and his intention was to postpone the interview so that he could consult with an attorney. (Plaintiff's Statement of Facts #20-24).

38.   Lt. DiLoreto reported to Col. Jones and KHP's General Counsel that Dawes refused to answer the interview questions or sign the Garrity/Lefkowitz Warning. Exhibit 5, Jones dep., 31:14-32:6; Exhibit 6, DiLoreto dep., 30:9-31:15.

Response:      Not controverted.

39.   There is no record or memory of any other KHP employee refusing to sign the Garrity/Lefkowitz Warning or refusing to be interviewed unless they had resigned prior to the interview. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxii; Exhibit 6, DiLoreto dep., 32:18-33:20; Exhibit 5, Jones dep., 32:7-33:20; 33:24-34:16; Exhibit 13, Def Response to 1st ROG, #7, p. 4.

Response:      Not controverted.

40.   Col. Jones resolved to discuss the incident with his executive command staff prior to deciding a course of action, although he did consider terminating Dawes immediately and discussed that option with executive command and legal counsel. Exhibit 5, Jones dep., 32:7-33:16; 38:3-18.

<u>Response</u>:      Not controverted. Colonel Jones convened a meeting with executive command and legal counsel to discuss this issue either later that day or the next day - no decision was made and Plaintiff was not terminated at that time. (Def. Ex. 5, Jones Depo. 32:07-33:16; Plaintiff's Statement of Facts #25-28). Defendant has produced no documentation in regard to this meeting with executive command. There are no listings on Defendant's privilege log noting any documents withheld in this time period. (Ex. D; Plaintiff's Statement of Facts #27).

41.   The KHP allowed Dawes to reappear for an interview days later because of the agency's obligation to C.K. to fully investigate her allegations. Exhibit 6, DiLoreto dep., 39:2-9; 49:2-13; Exhibit 5, Jones dep., 38:3-18.

<u>Response</u>:      Not controverted that the KHP allowed Plaintiff to be interviewed three days later on June 16, 2022. (Plaintiff's Statement of Facts #29-31). Controverted that the KHP had an obligation to fully investigate K.K.'s allegations. No KHP policy is cited for this obligation. Contrary to this assertion, policy documents show an investigation is discretionary, Def. Ex. 8 – policy AAA-02 – Sexual Harassment Policy Statement notes:

> "The EEO coordinator **may**, acting through the superintendent, cause a prompt and thorough investigation to be conducted and make recommendations to the regional commander regarding resolution of the situation." (emphasis added).

> (Def. Ex. 8; Plaintiff's Statement of Facts #32).

42.   At the second interview, on June 16, 2022, Dawes signed the Garrity/Lefkowitz warning. Exhibit 14, Garrity Warning; Exhibit 2, Dawes dep., 43:5-7.

<u>Response</u>:      Not controverted.

43.   During the June 16 interview, Dawes disclosed to Lt. DiLoreto that Dawes was transgender, Exhibit 6, DiLoreto dep., 42:9-10, and Dawes claimed to have not been in his right mind when sending the email to C.K. Id., 42:14-16.

Response:      Not controverted. The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts #40-42). The reason Plaintiff sent the email was that he was jealous that K.K. was a female and out there being herself and he was not able to do that as a transgender person. (Ex. 2, Dawes Depo 29:16-30:14).

44.   PSU completed the investigation of Dawes's conduct and submitted a final report to Col. Jones and the Executive Staff for review. Exhibit 6, DiLoreto dep., 45:16-46:4; Exhibit 5, Jones dep., 39:9-12.

Response:      Not controverted.

45.   The investigation concluded that Dawes's comments and email to C.K. violated KHP Policy ROC-09 and KHP AAA-02. Exhibit 6, DiLoreto dep., 43:13-16; 44:10-12.

Response:      Not controverted. The details of the alleged harassment by Plaintiff are not relevant as Plaintiff was never disciplined for his conduct and if he had not been terminated, he would have only been reprimanded for this conduct. (Plaintiff's Statement of Facts #40-42).

46.   Col. Jones determined Dawes's refusal to participate in the initial interview warranted termination. Exhibit 15, Term Ltr.; Exhibit 5, Jones dep., 16:14-19; 39:17-23; 42:8-22.

Response:      Not controverted that this is Defendant's stated reason for the termination and was Col. Jones' post-hoc subjective determination.

47.   Effective July 7, 2022, the KHP terminated Dawes's employment for the refusal to answer questions during the interview with the PSU on June 13, 2022. Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxiv.

Response:      Controverted. Defendant has incorrectly paraphrased the stipulated fact in the Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxiv. The full stipulated fact states:

"Effective July 7, 2022, KHP terminated Dawes' employment with the KHP. The stated reason was: "The reason for the dismissal is your refusal to answer questions during an interview with the Professional Standards Unit on June 13, 2022."" Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxiv.

48.   Dawes's conduct (in sending the email to C.K.) would not have warranted dismissal had Dawes not refused to cooperate in the investigation. Exhibit 5, Jones dep., 40:5-6.

<u>Response</u>:      Not controverted.   Plaintiff would have only received a reprimand. (Plaintiff's Statement of Facts #40-42).

## II.   <u>Plaintiff's Statement of Material Facts</u>

1.      Colonel Herman Jones was the decision-maker for the KHP with respect to Plaintiff's employment. (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ iv).

### <u>Discrimination Against a Transgender Person is Illegal and Against State Policy</u>

2.      State of Kansas Executive Order 19-02 – Prohibiting Discrimination in State employment, services and contracts, states:

> WHEREAS, the State of Kansas is committed to employment practices that prevent discrimination and harassment on account of race, color, gender, sexual orientation, gender identity …
> (Ex. A).

3.      Colonel Jones agrees that discrimination against a transgender person is illegal and against policy. (Def Ex. 5, Jones Depo 11:11-12:14).

### <u>Only Transgender Person in Kansas Highway Patrol</u>

4.      Colonel Jones was aware that Plaintiff was transgender before Plaintiff's termination. (Def. Ex. 5, Jones Depo. 16:20-17:07).

5.      Plaintiff was the only transgender employee in the Highway Patrol as far as Colonel Jones is aware. (Def. Ex. 5, Jones Depo. 20:03-06).

**Non-Documented Highway Patrol Meetings About Plaintiff**

6.      Plaintiff initiated a meeting with KHP's Human Resources Director Shellbie Blodgett and voluntarily disclosed he was transgender. Blodgett answered Plaintiff's questions regarding how a transitioning employee would be received at the KHP and learned more about the process for them to transfer from a male identity to a female identity. (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ viii).

7.      Plaintiff believed this disclosure was made in confidence. (Def. Ex. 2, Dawes Depo 16:1-3, 21:14-22).

8.      Defendant has produced no documentation in regard to Plaintiff's meeting with the Human Resources Director Blodgett. This meeting would not be privileged as Plaintiff was involved.

9.      Colonel Jones testified as follows about another meeting a couple of months before Plaintiff's termination with Highway Patrol executive staff to specifically discuss Plaintiff's status as a transgender person:

> Q. But you knew that he was in the process of being a transgender person when you made the decision to terminate him; correct?
> A. Correct.
> Q. When did you learn that?
> A. Learn?
> Q. That he was in the process of being a transgender person?
> A. I was trying to think of this. I don't know exact date, but I would say probably about a couple of months before this event happened.
> Q. How did you learn that?
> A. From what I was told, from what I understood, Mr. Dawes had contacted his supervisor, the supervisor felt that it was warranted for the staff and me to know, so myself and I believe at that particular time the assistant superintendent, legal counsel here, Mr. Ganieany, and also our HR director were informed of the information.
> Q. … So I believe her name is Ms. Macke?
> A. Yes.
> Q. Was she the one that informed you about that?

16

A. I did not get that directly from her. I got that from her supervisor, which would have been …. Major Eric Sauer. …

Q. Who does he go to?

A. At that time we convened a meeting, if you will, of the individuals I named: legal counsel, HR director, myself, the assistant superintendent, and also Major Sauer.

Q. Who was the HR person who was involved?

A. It would have been Shellbie Blodgett.

Q. And who was the assistant superintendent at the time?

A. It would have been Jason DeVore. …

Q. Who called this meeting about this?

A. I don't recall if I did or just we needed to get together so we can discuss.

Q. Why would you need to discuss that information?

A. One is it's unusual and, two, to prepare ourselves of what we needed to do to accommodate anything that was necessary for Mr. Dawes and his transition.

Q. And did anything become of that meeting? Were any policies put in place or anything like that?

A. No, at that particular -- what I remember is just I believe we were going to check with our department of administration which is the statewide department of personnel services to see what we needed to do or if they had encountered anything such as that so that we can better prepare ourselves for this transition, any type of training that we needed for our folks, ourselves, but basically we were just trying to prepare as much as possible a seamless transition for him to help in his accommodation.

(Def. Ex. 5, Jones Depo. 17:04-19:23).

10.     Defendant has produced no documentation regarding this meeting, nor the request to another department, about Plaintiff's transgender status with Superintendent Colonel Jones, Asst. Superintendent DeVore, Human Resources Director Blodgett, KHP General Counsel Gaineany, and Major Sauer. There are no listings on Defendant's privilege log noting any documents withheld in this time period with the meeting participants listed. (Ex. D, Privilege Log).

**Differing Policy Statements on Discipline Provided to Plaintiff**

**General Policy - ADM-07: Complaint Reporting and Administrative Investigations**

11.     ADM-07 is the general Highway Patrol policy titled "Complaint Reporting and Administrative Investigations" which is the policy related to policies and procedures for complaint

17

reporting by employees and investigations of those complaints. (Def. Ex. 5, Jones Depo 34:24-35:02).

12.     ADM-07 does not list what, if any, discipline will happen if someone does not comply with an investigation. (Def. Ex. 5, Jones Depo 36:01-04).

**June 7, 2022, Tuesday - Notice of the PSU investigation**

13.     The Notice of PSU Investigation does not list what, if any, discipline will happen if someone does not comply with an investigation. (Def. Ex. 10).

**Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities**

14.     The document Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities given to Plaintiff on June 7, 2022, states in relevant part:

> During an administrative investigation you may be interviewed and/or directed to provide written reports concerning this incident. … Your refusal to provide these responses, or any untruthfulness in your responses, will be considered insubordination and ***may subject*** you to disciplinary action. (emphasis added).

> (Def. Ex. 11; Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xiii.c.)

15.     The Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities does not describe what disciplinary action would be taken and does not mention termination. (Def. Ex. 11; Def. Ex. 5, Jones Depo 25:13-16).

**Garrity Warning**

16.     The Garrity/Lefkowitz II Warning provided to Plaintiff for the first time at the start of the June 13, 2022, interview states:

> I further wish to advise you that if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to disciplinary action which could result in your dismissal for the Kansas Highway Patrol.

> (Def. Ex. 14).

17.     In response to whether policies provided to Plaintiff provide differing policy statements about what would happen if an employee does not participate in an interview, Colonel Jones stated: "The wording is not exact throughout, but it does give direction." (Def. Ex. 5, Jones Depo 36:05-11).

**June 9, 2022, Thursday - Letter mailed to Plaintiff**

18.     On June 9, 2022, Cpt. DiLoreto mailed Plaintiff a letter to Plaintiff's home address and instructed Plaintiff to appear for an interview on June 13, 2022, at 1:00 p.m. (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xiv.).

19.     The June 9, 2022 letter states: "You may have representation if you so desire." (Def. Ex. 12).

**Interview June 13, 2022, Monday**
**Plaintiff Requested to Consult with Attorney Before Answering Questions**

20.     The interview on June 13, 2022, lasted a total of 5 minutes and 24 seconds. (Def. Ex. 17, Video). This was the first time Plaintiff had seen the Garrity form. (Def. Ex. 2, Dawes Depo. 36:25-37:11; Def. Ex. 16).

21.     During the interview on June 13, 2022, Plaintiff requested to speak with an attorney or asked about having an attorney multiple times:

a.     "I would just like to, I'm only asking to speak with my attorney. I understand, I want to cooperate with you, truly I'm not trying to be argumentative, I'm not trying to be difficult."

b.     "I'm only trying to protect myself just as KHP is trying to do the same for theirselves so. I just can't discuss this without my legal counsel present to be within the loop you know."

c.     "Well first of all, I mean I do, I assume that we are going to get into the meat and bones of this sooner or later, so what's the next step moving forward and can I have an attorney present or am I to understand that there's, you are not going to allow me to have an attorney for any of this, just so I understand."

19

d.      "And again, I want you to understand that I'm not saying I'm not going to cooperate, I'm only saying I want to consult with my attorney before we get in, before we discuss anything."

e.      "You know, I you know I just would like to consult with an attorney first and … And then move forward to see where we stand."

(Def. Ex. 16, interview transcript).

22.      Before June 13, 2022, Plaintiff spoke with an attorney and "was not advised not to cooperate" and was advised to request a postponement of the interview on June 13, 2022. (Def. Ex. 2, Dawes Depo. 36:10-24). It was Plaintiff's intention to request a postponement of the interview on June 13, 2022 so he could further consult with an attorney. (Def. Ex. 2, Dawes Depo. 36:10-24).

23.      The Garrity warning notes that:

You are entitled to all the rights and privileges guaranteed by the laws and the constitution of this state and the Constitution of the United States, including the right to not be compelled to incriminate yourself.

(Def. Ex. 14).

24.      State policy grants an employee the right to speak to an attorney. (Def. Ex. 5, Jones Depo. 30:21-31:03).

**<u>Plaintiff was Not Terminated Immediately for his Refusal to Answer Questions-
No Documents Produced</u>**

25.      Colonel Jones was made aware that Plaintiff did not answer questions during the June 13, 2022, interview later that same day. (Def. Ex. 5, Jones Depo. 31:14-32:06).

26.      Colonel Jones convened a meeting with executive command and legal counsel to discuss this issue either later that day or the next day. No decision was made and Plaintiff was not terminated at that time. (Def. Ex. 5, Jones Depo. 32:07-33:16).

20

27.     Defendant has produced no documentation in regard to this meeting with executive command. There are no listings on Defendant's privilege log noting any documents withheld in this time period. (Ex. D).

28.     Col. Jones considered terminating Plaintiff prior to Thursday, June 16, 2022 and after the Monday, June 13, 2022 interview, but did not do that. (Def. Ex. 5, Jones Depo.38:03-21).

**Colonel Jones Agreed to a Rescheduled Second Interview on June 16, 2022**

29.     Plaintiff talked with an attorney after the June 13, 2022 interview and was advised to go ahead with the interview, cooperate, and sign the Garrity warning. (Def. Ex. 2, Dawes Depo. 40:25-41:09).

30.     On June 14, 2022, Plaintiff called PSU and requested an opportunity to be interviewed.  (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xix.).

31.     Colonel Jones approved Plaintiff's request to be interviewed following Plaintiff's initial refusal. (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xx.).

**No "Obligation" to Complete Investigation**

32.     The KHP does not have an obligation to complete the investigation – an investigation is discretionary. Policy AAA-02 – Sexual Harassment Policy Statement notes:

> "The EEO coordinator **may**, acting through the superintendent, cause a prompt and thorough investigation to be conducted and make recommendations to the regional commander regarding resolution of the situation." (emphasis added).

(Def. Ex. 8 – AAA-02 – Sexual Harassment Policy Statement).

**June 16, 2022, Thursday - Interview**

33.     On Thursday, June 16, 2022, Plaintiff signed the Garrity warning, answered all questions and cooperated fully with the interview. (Def. Ex. 6, DiLoreto Depo. 40:15-41:01; Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxi.).

34.     There was no prejudice to the investigation because of the three-day delay in the interview. (Def. Ex. 5, Jones Depo. 39:05-08; Def. Ex. 6, DiLoreto Depo. 41:07-41:15).

35.     The investigation was concluded after Plaintiff's interview on June 16, 2022 – the only thing to be done was to draft the report. (Def. Ex. 6, DiLoreto Depo. 43:17-25).

**Plaintiff Thought he was being Targeted for Being Transgender in the Investigation**

36.     Colonel Jones was aware that after Plaintiff was notified he was on administrative leave, Plaintiff called his supervisor, Ms. Macke, and Ms. Macke in turn, called to tell the PSU investigator that Plaintiff had decided to transition from male to female and that he said that he thought he was being targeted with the investigation because he had recently made that decision. (Def. Ex. 5, Jones Depo. 25:17-26:17).

37.     Plaintiff told the PSU investigator that he was transgender in his June 16, 2022 interview and that was noted in the investigation report. (Def. Ex. 6, DiLoreto Depo. 41:21-23, 42:17-20)

**Termination**

38.     Colonel Jones received the investigation report, reviewed the report, and then made the decision to terminate Plaintiff. (Def. Ex. 5, Jones Depo. 42:01-19).

39.     Effective July 7, 2022, KHP terminated Plaintiff's employment with the KHP. The stated reason was: "The reason for the dismissal is your refusal to answer questions during an interview with the Professional Standards Unit on June 13, 2022." (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxiv).

**No Discipline Prior to Termination**

40.     Dawes was never disciplined for his actions in sending the email to the female co-worker. (Pretrial Order, Doc. 25, § 2.a, Stipulation ¶ xxiiii).

41.     Plaintiff was never disciplined for any issues prior to termination. (Def. Ex. 5, Jones Depo 43:21-44:03)

42.     Even if Plaintiff would not have been terminated for the reasons stated by the Highway Patrol, Plaintiff would not have been terminated for his actions in sending the email to K.K., he merely would have been disciplined with some sort of reprimand. (Def. Ex. 5, Jones Depo 39:17-40:06).

**Good Work Performance**

43.     Plaintiffs' work performance played no role in the termination and Plaintiff was a good employee. (Def. Ex. 5, Jones Depo 44:08-13).

**Plaintiff Requested All Documents Related to Plaintiff in Discovery**

44.     Plaintiff requested all documents related to Plaintiff's employment with Defendant in discovery. For example, Request for Production No. 1 and 2 to Defendant state:

1.      Documents or other things, including electronic media, relating to or referencing any aspect of Plaintiff's employment, discipline, Defendant's investigation into Plaintiff, witness statements, conclusions of any investigation, findings and/or Plaintiff's termination.

2.      Documents in plaintiff's personnel file, human resources file, payroll file and any other file kept or maintained by Defendant referring to Plaintiff.

(Ex. C, Defendant's Response to Plaintiff's First Request for Production of Documents).

**III.     Standard for Summary Judgment**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also *Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008). In applying this standard, courts view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

In the context of employment discrimination, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221-22 (10th Cir. 2015)(quoting *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir.1995)). Many of the highly fact-sensitive determinations involved in these cases "are best left for trial and are within the province of the jury." *Id.*; see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)("[T]he inquiry [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury....").

Consequently, "in this Circuit ... an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015)(quoting *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir.1998) (Tacha, J., concurring in part); see *Randle*, 69 F.3d at 452 ("[I]f ... inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.").

In ruling on summary judgment, the trial court should not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "If reasonable minds could differ as the import of the evidence" summary judgment is inappropriate. *Anderson*, 477 U.S. at 250.

## IV.   Plaintiff's Claims

Plaintiff makes the following claim:  Count I – Sex discrimination under Title VII, 42

24

U.S.C. §2000e, *et seq.*

### A.    Plaintiff is Transgender

Plaintiff is a transgender person. Defendant was aware at the time of termination that Plaintiff was transgender. An employer who fires an individual for being transgender violates Title VII.

> *Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731, 1737 (2020) held:
>
> An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids.

### B.    Prima Facie Case and Burden Shifting

Plaintiff agrees that he does not have direct evidence of discrimination, therefore his claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Glenn v. P1 Group, Inc*., 2023 WL 3019661 at 6 (Case No. 22-2121-JWB, April 20, 2023); also see *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Under that framework, Plaintiff has the initial burden to establish a prima facie case of discrimination. *Id*. To demonstrate a prima facie case of discrimination, Plaintiff must establish that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Id*.

The burden then shifts to Defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. If Defendant meets this burden, Plaintiff must come forward with evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters*., 647 F.3d 943, 947 (10th Cir. 2011)).

**C.** **Plaintiff is not Required to Demonstrate Disparate Treatment to Establish Prima Facie Case**

Defendant contends that Plaintiff is required to prove that he was treated less favorably than others not in the protected class to establish a prima facie case of discrimination. Plaintiff is not required to prove disparate treatment at the prima facie stage.

A plaintiff asserting discriminatory discharge, "does not have to show differential treatment of persons outside the protected class to meet the initial prima facie burden under *McDonnell Douglas*." *Monroe v. City of Lawrence, Kan.*, 124 F.Supp.3d 1097, 1111 (D.Kan. 2015)(quoting *English v. Colorado Dept. of Corr.*, 248 F.3d 1002, 1008 (10th Cir. 2001)). An inference of discriminatory discharge arises if "an employee who belongs to a racial minority ... eliminates the two most common, legitimate reasons for termination, i.e., lack of qualification or the elimination of the job." *Monroe*, 124 F.Supp.3d at 1111 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir.2000)).

Accordingly, a prima facie case of discriminatory discharge generally requires plaintiff to produce evidence that: (1) he belongs to a protected class; (2) he was qualified and satisfactorily performing his job duties; (3) despite his qualifications, he was fired; and (4) his position was not eliminated after his discharge. *Kendrick,* 220 F.3d at 1229 ("The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement."). The burden of establishing a prima facie case is "not onerous" but, rather, "de minimis." *Monroe v. City of Lawrence, Kan.*, 124 F.Supp.3d 1097, 1111-12 (D.Kan. 2015)(quoting *Plotke v. White*, 405 F.3d 1092, 1099, 1101 (10th Cir.2005)).

Defendant has conceded that Plaintiff is qualified, was a member of a protected class, and

26

suffered an adverse employment action. There is no evidence that Plaintiff's position was eliminated in a force reduction or otherwise. This was also the case in both *Monroe* and *English, supra,* and both Courts held that even though no evidence from either side was produced about job elimination, because of the stated reasons for the terminations there was no question plaintiff's positions were not eliminated. See *Monroe v. City of Lawrence, Kan*., 124 F.Supp.3d 1097, 1112 (D.Kan. 2015); *English v. Colorado Dept. of Corr*., 248 F.3d 1002, 1008 (10th Cir. 2001). Defendant's termination reason does not involve job elimination. Plaintiff has established a prima facie case of discrimination.

### D.    Defendant's Stated Reason for Termination

Defendant has stated that it terminated Plaintiff because he refused to answer questions during the June 13, 2022 interview. It will be shown below that a reasonable jury could find that this reason is pretextual and not the real reason for Plaintiff's termination. The real reason is that Plaintiff is transgender.

## V.    Defendant's Stated Termination Reason is Pretextual

Plaintiff can demonstrate pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Walton v. Unified Gov. of Wyandotte Cty./Kansas City, Kansas*, 2023 WL 3948634 at 1 (Case No. 21-2532-JWB, June 12, 2023)(quoting *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013). "[I]n this Circuit ... an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Id*. (quoting *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1221 (10th Cir. 2015) (further citations omitted).

27

"[T]he evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms… A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Plotke v. White*, 405 F.3d 1092, 1102–03 (10th Cir. 2005)(quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000)). Plaintiff can establish pretext by showing that the "employer's proffered non-discriminatory reasons [were] either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Glenn v. P1 Group, Inc.*, 2023 WL 3019661 at 6 (Case No. 22-2121-JWB, April 20, 2023)(quoting *Plotke v. White*, 405 F.3d 1092, 1102–03 (10th Cir. 2005) (further quotations omitted).

Evidence of pretext includes evidence tending to show "that the defendant's stated reason for the adverse employment action was false." *Glenn v. P1 Group, Inc.*, 2023 WL 3019661 at 6 (Case No. 22-2121-JWB, April 20, 2023)(quoting *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1150 (10th Cir. 2011)). A plaintiff is not required to show that each reason proffered shows pretext on its own, rather the court looks at the totality of the circumstances to find circumstantial evidence of pretext. *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 884 (10th Cir. 2018)(citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998)). An invidious discriminatory purpose may be inferred from totality of the relevant facts, taking the evidence into consideration on the whole. *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

While plaintiff's burden is not onerous ... it is also not "empty or perfunctory." *Moss v. Bluecross, Blue Shield of Kansas, Inc*, 534 F.Supp.2d 1190, 1203 (D. Kan 2008)(citing *Morgan v. Hilti, Inc*, 108 F.3d 1319, 1323-24 (10th Cir. 1997). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the

trier of fact to conclude that the employer unlawfully discriminated." *Plotke v. White*, 405 F.3d

1092, 1102 (10th Cir. 2005)(citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

148 (2000)(further citation omitted). The Supreme Court has held that:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly
> if disbelief is accompanied by a suspicion of mendacity) may, together with the
> elements of the prima facie case, suffice to show intentional discrimination.  Thus,
> rejection of the defendant's proffered reasons will permit the trier of fact to infer
> the ultimate fact of intentional discrimination.

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742 (1993).

The Supreme Court reaffirmed and clarified those principles in *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133 (2000):

> Proof that the defendant's explanation is unworthy of credence is simply one form
> of circumstantial evidence that is probative of intentional discrimination, and it may
> be quite persuasive....  In appropriate circumstances, the trier of fact can reasonably
> infer from the falsity of the explanation that the employer is dissembling to cover
> up a discriminatory purpose....  Moreover, once the employer's justification has
> been eliminated, discrimination may well be the most likely alternative explanation,
> especially since the employer is in the best position to put forth the actual reason
> for its decision....  Thus, a plaintiff's prima facie case, combined with sufficient
> evidence to find that the employer's asserted justification is false, may permit the
> trier of fact to conclude that the employer unlawfully discriminated.

*Id*. at 147-148 (citations omitted).

Certainly, "[i]t is not the purpose of a motion for summary judgment to force the judge to

conduct a 'mini-trial' to determine the defendant's true state of mind." *Pinkerton v. Colorado Dept.*

*of Trans.*, 563 F.3d 1052, 1066 (10th Cir. 2009)(quoting *Randle v. City of Aurora*, 69 F.3d 441,

453 (10th Cir. 1995)). For summary judgment purposes, as "long as the plaintiff has presented

evidence of pretext ... upon which a jury could infer discriminatory motive, the case should go to

trial." *Id*.; see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### A.     Examples of Pretext

The following examples of pretext, taken in the totality of the circumstances, are sufficient to meet Plaintiff's burden and Defendant's Motion for Summary Judgment should be denied.

#### 1.     Termination Reason is Not the Whole Truth

Plaintiff did not complete the interview on Monday, June 13, 2022. He wanted to talk with an attorney and asked to do so multiple times. His intent was to talk with a lawyer and then proceed. However, Plaintiff did participate in a full and complete interview three days later, on Thursday, June 16, 2022. There was admittedly no prejudice to a three-day delay in completing the interview.

In context, Plaintiff's declination to complete the interview on June 13, 2022 is not the full story. A reasonable jury is entitled to make the decision as to whether Defendant's stated reason is a post-hoc reason for termination.

#### 2.     Defendant Agreed to Reschedule Interview for June 16, 2022

Defendant agreed to allow Plaintiff to reschedule the Monday, June 13 interview until Thursday, June 16, 2022. Either later in the day on Monday, June 13, 2022, or the next day, Tuesday, June 14, 2022, Plaintiff asked to reschedule the interview. Colonel Jones was notified and approved the rescheduled interview. A reasonable jury could conclude that the June 13, 2022, interview was not as important as Defendant now contends and that the termination is pretextual.

#### 3.     Plaintiff Not Fired Immediately

Plaintiff was not fired immediately on June 13, 2022, nor was he fired before he was allowed to reschedule the interview for three days later. Colonel Jones and command staff were aware of the interview on June 13, 2022 and what occurred.

Defendant alleges it had an "obligation" to complete the investigation. There is no policy that obligates that the Highway Patrol complete an investigation, and contrary, policy AAA-02 –

the Sexual Harassment policy states that the Highway Patrol "may" conduct an investigation. It does not say the Highway Patrol "shall" conduct an investigation, rather an investigation is discretionary.

Colonel Jones claims that he convened a meeting with command staff after June 13, 2022 but before June 16, 2022, and they decided that Plaintiff should not be fired then – though he claims he considered it. No documentation exists for these contentions and this meeting with command staff. A jury is entitled to decide the factual issues as to whether Defendant's reason for firing Plaintiff are true or whether they are post hoc decisions.

If Plaintiff's refusal to participate in the June 13 interview was a major infraction which would subject an employee to termination, he would have been terminated immediately. He was not terminated immediately.

Alternatively, if Plaintiff's refusal to participate in the June 13 interview was a major infraction which would subject an employee to termination, and Defendant did have an obligation to complete the investigation, Plaintiff would have been terminated immediately after the June 16 interview. The investigation was fully completed after Plaintiff's interview on June 16, 2022. There was no need to allow him to be paid another three weeks by the state if he should have been terminated for the June 13 interview.

Alternatively, immediately terminating Plaintiff would have removed any need for any further investigation. No matter what the investigation results were, Plaintiff had been accused of harassment and terminating him would have removed any need to investigate as he would have been fully removed from employment and no further contact or harassment could take place.

These are some of the factual questions on which a jury is entitled to make a decision and why summary judgment should be denied.

### 4.     Plaintiff Asks to Consult with Counsel

In context, the reason Plaintiff refused to answer questions on June 13, 2022 was because he wanted to talk with an attorney first. Plaintiff was protected by the right to counsel under the policies of the state and by constitutional guarantees. He was also notified by letter that he had the right to representation, which he believed included consulting with an attorney. The first time he was notified that he had to answer questions or risk being fired was at the beginning of the interview on June 13, 2022. Plaintiff had already been advised to cooperate and was advised to seek a postponement to consult with a lawyer. Plaintiff's intent was to simply postpone the interview, talk with a lawyer, then fully cooperate. That is what happened.

A jury is entitled to view the video of the June 13, 2022, and in context decide why Plaintiff was refusing to answer interview questions and whether terminating Plaintiff's employment for that reason is a valid reason or determine if that reason is a pretext for discrimination.

### 5.     No Documentation of Several Meetings Prior to Termination

Multiple meetings specifically involving Plaintiff were held with human resources and executive command staff that were not documented in any way. An employer's procedural irregularities or action contrary to policy or practice can be used to show pretext. *Plotke v. White*, 405 F.3d 1092, 1099, 1104 (10th Cir.2005).

Plaintiff assumes that any relevant and responsive documentation from the Highway Patrol was produced by the Defendant. Plaintiff requested all documents relating to Plaintiff's employment and Defendant is under an obligation under Rule 26(a) to produce all relevant documents. Defendant noted these meetings occurred in their statement of facts and therefore any documents relating to these meetings are relevant. If these documents existed, they would have been produced.

### a.      Plaintiff Meets with Human Resources Director

Plaintiff initially had a meeting with Human Resources Director Shelbie Blodgett to discuss the process for Plaintiff to transfer from a male to a female identity at work. Plaintiff believed the disclosures were made in confidence. This meeting would not have been privileged as Plaintiff was involved.

No documents were produced regarding this meeting. Therefore, no documents exist regarding this meeting. It is a procedural irregularity to not document a meeting with the Human Resources Director. The Human Resources Director was involved in subsequent meetings with executive staff about Plaintiff as noted below.

### b.      Executive Meeting to Discuss Plaintiff's Transgender Status

A couple of months before Plaintiff was terminated, Highway Patrol Superintendent Colonel Herman Jones, held a meeting with the Assistant Superintendent Jason DeVore, Human Resources Director Shelbie Blodgett, KHP General Counsel Luther Gaineany, and Major Eric Sauer. In a department with 800 employees, the singular purpose of this meeting with all high-level executives was to discuss Plaintiff's transgender status. Also, allegedly these executives sought advice and additional information relating to training from the Kansas Department of Administration.

No documents were produced regarding this executive meeting nor the request for additional information from the Kansas Dept. of Administration. This indicates that there are no documents related to this meeting or this request for additional information. There are no listings on Defendant's privilege log noting any documents withheld in this time period with these meeting participants.

It is highly improbable that a meeting with all executives of the Highway Patrol, or a

33

request for more information to another department, could happen without some sort of documentation – emails, notes, electronic meeting requests, calendar notations or other documentation. This is a serious procedural irregularity.

A reasonable jury could conclude that the Highway Patrol was acting in an irregular manner in not documenting this meeting. A reasonable jury could conclude that Colonel Jones' testimony regarding the purpose of this meeting was a post hoc fabrication and the real reason for the meeting was to discuss terminating Plaintiff because of his transgender status. A jury is entitled to make this decision.

    **c.**       <u>Colonel Jones Meeting with Command Staff between June 13 and June 16</u>

Between Monday, June 13 and Thursday, June 16, 2022, Col. Jones claims he discussed the June 13, 2022 interview with his executive command staff before deciding on a course of action, although he claims he did consider terminating Plaintiff immediately and discussed that option with the same executive command and legal counsel.

No documents were produced regarding this meeting. Therefore, no documents exist regarding this meeting. It is another procedural irregularity to not document a meeting with the command staff. There are no listings on Defendant's privilege log noting any documents withheld in this time period. A reasonable jury is entitled to make the decision as to whether the Highway Patrol was acting in an irregular manner and whether this is a post hoc fabrication of what occurred. A reasonable jury could conclude that this meeting was to discuss terminating Plaintiff because of his transgender status.

    **6.**       <u>Never Done Before – Plaintiff Only Transgender Person in Highway Patrol</u>

Defendant states that no other employee had ever refused to answer questions in an administrative investigation such as this. It has also been shown that Plaintiff was the only

transgender employee in the over 800 employee Kansas Highway Patrol.

Under these circumstances, a reasonable jury could conclude that Defendant's reason for firing Plaintiff is pretextual. Plaintiff thought that he was being targeted with the investigation. A jury is entitled to consider and determine whether Plaintiff was singled out as the only transgender employee in the Highway Patrol and fired because of that status.

### 7. <u>State and Highway Patrol Policies Give Differing Statements as to Discipline</u>

Plaintiff was provided with differing policy statements about what discipline, if any, he would receive during the investigation if he refused to answer questions. Procedural irregularities can show pretext. *Plotke v. White*, 405 F.3d 1092, 1099, 1104 (10th Cir. 2005).

When Plaintiff was first hired, he acknowledged ADM-07, the general policy titled "Complaint Reporting and Administrative Investigations" which is the policy related to policies and procedures for complaint reporting by employees and investigations of those complaints. ADM-07 does not list what, if any, discipline will happen if someone does not comply with an investigation.

After the Highway Patrol decided to conduct an investigation, and when Plaintiff was notified that he was to be placed on Administrative Leave on June 7, 2022, he was given written notice of the PSU investigation. The Notice of PSU Investigation does not list what, if any, discipline will happen if someone does not comply with an investigation.

Also on June 7, 2022, Plaintiff was given the Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities, which states that a refusal to provide these responses, or any untruthfulness in your responses, will be considered insubordination and may subject you to disciplinary action. The Employee Conduct Complaint Investigation, Employee's Rights and Responsibilities does not describe what disciplinary action would be taken and does not mention

termination.

The Garrity/Lefkowitz II Warning provided to Plaintiff for the first time at the start of the June 13, 2022, interview states that a refusal to answer questions could result in dismissal. This was the first time Plaintiff was provided with a policy that stated anything about dismissal. Plaintiff had been trying to consult with an attorney, but was unable to get ahold of one for a full consultation on the Friday or Monday morning before his interview. He requested to consult with an attorney multiple times during the June 13, 2022 interview.

Colonel Jones admitted that in regard to these differing policy guidelines about discipline, "The wording is not exact throughout, but it does give direction." A jury is entitled to weigh these differing policy guidelines and determine whether they show pretext in Defendant's decision.

### 8.    <u>Plaintiff – Good Employee and No Discipline Prior to Termination</u>

Plaintiff was a good employee and never disciplined for any issues prior to termination. Plaintiff was never disciplined for the alleged harassment regarding the email to K.K. Defendant also admits that if Plaintiff had remained employed, he would have only received a reprimand, not termination, given the results of the investigation.

A reasonable jury could find that this and the reason given for Plaintiff's termination decision is pretext for retaliation.

### VI.    <u>Conclusion</u>

A jury is entitled to hear this matter and make the decision whether Plaintiff was fired because he is transgender or because of the reason Defendant states. Plaintiff requests that Defendant's Motion for Summary Judgment be denied.

### VII.    <u>Request for Oral Argument</u>

Pursuant to D.Kan Local Rule 7.2, Plaintiff would request a hearing on Defendant's motion

at a time convenient for the Court and the parties.

**THORNBERRY BROWN, LLC**

By:     /s/ Randall W. Brown
        Randall W. Brown          KS# 17905
        *randy@thornberrybrown.com*
        Stephen C. Thornberry     KS# 17494
        s*teve@thornberrybrown.com*
        4550 Main Street, Suite 205
        Kansas City, Missouri 64111
        (816) 531-8383 *telephone*
        (816) 531-8385 *facsimile*
        ATTORNEYS FOR PLAINTIFF

Certificate of Service

I hereby certify that a copy of the foregoing
was filed via the court's electronic filing system
for service on this 8th day of December, 2023 to:

Fisher, Patterson, Sayler & Smith, LLP
David R. Cooper       #16690
Crystal B. Moe        #29168
3550 SW 5th Street
Topeka, Kansas 66606
Tel: (785) 232-7761
Fax: (785) 232-6604
dcooper@fpsslaw.com
cmoe@fpsslaw.com
ATTORNEYS FOR DEFENDANT

/s/      Randall W. Brown
Randall W. Brown