## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WILLIAM H. DAWES, JR.,

       *Plaintiff*,

v.

STATE OF KANSAS,

       *Defendant*.

Case No. 2:23-cv-02005-EFM

## MEMORANDUM AND ORDER

This matter is before the court on Defendant State of Kansas's motion for summary judgment (Doc. 28).  The motion is fully briefed and ripe for decision.  (Docs. 28, 30, 31). Defendant's motion is DENIED for the reasons stated herein.

### I.      Factual and Procedural Background[1]

Plaintiff Williams H. Dawes, Jr. filed a Title VII discrimination claim against Defendant on January 5, 2023.  Plaintiff claims that Defendant discriminatorily fired him because he identifies as transgender.  He seeks lost wages, punitive damages, and attorney's fees and costs.  Conversely, Defendant asserts that Plaintiff's dismissal stems from his refusal to participate in an investigatory interview regarding Plaintiff's alleged sexual harassment of a coworker.  On November 20, 2023, Defendant filed the present motion for summary judgment.

---

[1] The facts are those undisputed by the parties unless otherwise noted.

Plaintiff worked for the Kansas Highway Patrol ("KHP") as a civilian employee, namely a Public Service Administrator II.  The parties agree that Plaintiff was a good employee and fully qualified for his position.  At all times relevant to this case, Colonel Herman Jones was the Superintendent of the KHP and the decisionmaker with respect to Plaintiff's employment.

Plaintiff disclosed to three KHP employees that he identified as transgender.  He also initiated a meeting with Human Resources Director Shellbie Blodgett to discuss transitioning from a male identity to a female identity at work.  Blodgett contacted Jones and other supervisory staff to hold a meeting regarding the necessary measures to accommodate Plaintiff's requested transition.[2]

On June 6, 2022, Plaintiff sent an email to a female co-worker describing his pleasure at her wearing heels and "expressing her femininity." (Doc. 30-3 at 1.)  Interpreting Plaintiff's email as sexual harassment, the co-worker forwarded Plaintiff's email to supervisor Captain Mitchell Clark. The co-worker also shared that Plaintiff had previously made her uncomfortable when he said that he "appreciated a woman wearing heels and panty hose, and how nice it was to see a female really taking care of herself." (Doc. 28-4 at 1.)  Clark sent the email and the co-worker's concerns to Blodgett, who shared them with Jones.

On June 7, Jones had the Professional Standards Unit ("PSU") initiate an administrative investigation into Plaintiff's alleged harassment.  That same day, the PSU officer in charge of the investigation, Dan DiLoreto, hand-delivered two letters advising Plaintiff of the investigation and warning him that failure to cooperate could subject him to disciplinary action.

---

[2] Defendant did not produce any records of this meeting during discovery.

On June 9, DiLoreto mailed a letter to Dawes which instructed him to appear for an interview on June 13.  The letter stated, "You are to give your full cooperation in this matter," and informed Plaintiff that he could bring an attorney to the interview.   (Doc. 28-12 at 1.)

On June 13, Plaintiff arrived for the interview without counsel.  Before beginning the interview, DiLoreto provided Plaintiff with a Garrity/Lefkowitz Warning (the "Warning").  The Warning stated that "if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to disciplinary action which could result in your dismissal from the Kansas Highway Patrol."  DiLoreto notified Plaintiff that he needed to sign the Warning before the interview.  He also emphasized that not signing the Warning would result in discipline.

After reviewing the Warning, Plaintiff expressed his understanding of it by saying "you'll fire me if I don't talk to you, basically."  (Doc. 28-16 at 1.)  DiLoreto responded, "Right," before elaborating "this doesn't say we will, this just lays out consequences for not participating."  (*Id.*)  Plaintiff commented, "Certainly implies you will," to which DiLoreto responded, "OK."  (*Id.*)

With this understanding, Plaintiff claimed he was not comfortable signing the Warning without his attorney present.  When asked whether he was prepared to do the interview that day, Plaintiff repeatedly responded, "I can't."  (*Id.*)  Plaintiff then asked how to proceed with the investigative process and requested having an attorney present during further meetings.  He also claimed that he was willing to cooperate once he had counsel.  In response, DiLoreto emphasized that Plaintiff was not guaranteed another interview.  Verbally accepting this fact, Plaintiff nevertheless maintained that he would not sign the Warning without counsel present.  Shortly after, DiLoreto terminated the interview.  No other KHP personnel had ever refused to sign the Warning.

DiLoreto informed Jones that Plaintiff refused to participate in the interview.  On June 14, Plaintiff called the PSU and requested another interview.  Although Jones considered terminating Plaintiff immediately, he scheduled another interview to take place on June 16.  When asked during his deposition why he allowed this second interview, Jones claimed he wanted to "give [Plaintiff] that grace to come in and allow him to come in and cooperate." (Jones Dep., Doc. 28-5 at 38:20–21.)  He also stated that he had a duty to Plaintiff's co-worker to complete the investigation.  The June 16 interview proceeded without incident as Plaintiff cooperated fully and answered all questions.  The PSU ultimately concluded that Plaintiff's email to his coworker violated KHP polices.  Plaintiff, however, did not receive any discipline for his actions occurring on June 6.

Despite the investigation's conclusion, Jones determined that Plaintiff's refusal to sign the Warning on June 13 warranted termination.  On July 7, the KHP fired Plaintiff, stating "[t]he reason for the dismissal is your refusal to answer questions during an interview with the Professional Standards Unit on June 13, 2022." (Doc. 28-15 at 1.)  There is no evidence before this court regarding whether Plaintiff's position remained within the KHP after his termination.

During his deposition, Jones asserted that the sole reason for Plaintiff's termination was his refusal to answer question on June 13.  When asked about what discipline Plaintiff would have received had the investigation run its normal course, Jones admitted that he would not have terminated Plaintiff.  He also confirmed that the three-day delay caused by Plaintiff's interview occurring on June 16 instead of June 13 did not impede the investigation.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are

"genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies. D. Kan. R. 56.1(a). "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id.* To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in Blue Cross's summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

### III.   Analysis

Plaintiff asserts a discriminatory discharge claim on the basis of sex pursuant to Title VII, 42 U.S.C. §2000e, *et seq.* Specifically, Plaintiff claims that Defendant fired him because of his transgender status.

To survive summary judgment in Title VII cases, a plaintiff must establish discrimination through either direct evidence or through the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must first put forth evidence establishing a prima facie case of discrimination.

*See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012); *see also Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) ("Under the *McDonnell Douglas* framework, a plaintiff must first 'raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations.'") (citation omitted).  "Only after the plaintiff clears this initial hurdle does the burden shift to the employer to prove a 'legitimate, non-discriminatory reason for the adverse employment action.'"  *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Khalik*, 671 F.3d at 1192).  Finally, should the employer carry its burden, a plaintiff must "introduce evidence that the stated nondiscriminatory reason is merely a pretext."  *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir. 2019) (citation omitted).

> **A.     Plaintiff meets his prima facie case.**

The parties agree that Plaintiff does not offer any direct evidence of discrimination. Therefore, his case proceeds under the familiar *McDonnell Douglas* analysis.  However, the parties argue over the proper articulation of a Plaintiff's prima facie burden.

The Tenth Circuit has acknowledged that the elements to establish a prima facie case under *McDonnell Douglas* "may vary depending on the context of the claim and the nature of the alleged conduct."  *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 n.1 (10th Cir. 2015) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802 n.13).  The preferred framework, however, is a three-prong prima facie test articulated by the Supreme Court in *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).  *See Bennett*, 792 F.3d at 1266 n.1; *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 n.4 (10th Cir. 2013).  Under this preferred framework, the evidence must demonstrate "that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

Here, however, the parties rely upon a four-part framework, but they disagree over the fourth element.  But after reviewing the case law, the court finds that there is no material difference between Plaintiff and Defendant's articulation of the fourth element.  In fact, Plaintiff's version is just a more specific example of Defendant's articulation of the fourth element.[3]  Moreover, the Tenth Circuit in *Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005), explained that the prima facie framework is flexible and was not intended to be a mechanized, rigid test.  *See id.* at 1099.  Lastly, whether a party argues a discriminatory discharge claim under the more concise three-part framework or a four-part framework, "[t]he critical prima facie inquiry in all cases is whether plaintiff demonstrates that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"[4]  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Applicable to this case, the court in *Plotke* asserted that "[t]he most common non-discriminatory reasons for discharge are (1) 'lack of qualification' or (2) 'elimination of the job.'" 405 F.3d at 1099 (quoting *Kendrick*, 220 F.3d at 1229).  Contrariwise, if a protected class member demonstrates he was qualified for the position and the job/position was not eliminated after his discharge, there is an inference of unlawful discrimination.  *See Monroe v. City of Lawrence*, Kan.,

---

[3] Plaintiff's fourth element is from *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136 (10th Cir. 2008): "(4) [the] position was not eliminated after . . . discharge." *Id.* (citing *Kendrick*, 220 F.3d at 1229).  Defendant's fourth element is "(4) [plaintiff] was treated less favorably than others not in the protected class." *Khalik*, 671 F.3d at 1192 (citing *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)).  However, Defendant quotes *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004) in its reply brief, which again lays out Defendant's four-part framework but also provides an example of the fourth element: "e.g., the position at issue remained open after the adverse employment action." *Id.* at 1134.  Thus, while Defendant claims its fourth element is different from Plaintiff's, the case law Defendant relies upon indicates that Plaintiff's iteration of the fourth element is an example of how a protected class member can be treated differently.

[4] What has been deemed the "critical inquiry" under the prima facie test is also the third element in the Tenth Circuit's preferred three-part prima facie framework.

124 F. Supp. 3d 1097, 1111 (D. Kan. 2015) (citing *Kendrick*, 220 F.3d at 1229) (discussing how eliminating the two most common legitimate reasons for termination raises an inference of discrimination).

Here, the parties do not dispute that Plaintiff was a member of a protected class as a transgender person and suffered an adverse employment action.[5]  The parties also agree that Plaintiff was qualified for his position as a Public Service Administrator II.  But neither party submits any evidence on whether Defendant eliminated Plaintiff's job after his discharge.  At the prima facie stage, providing evidence as to this element is Plaintiff's responsibility.  He offers no reason as to why he was unable to do so.

Nevertheless, when a defendant fires a plaintiff for cause, the Tenth Circuit has been willing to conclude that the evidentiary record supports a finding that the plaintiff was not terminated as part of a workforce reduction, and thus, the position was not eliminated.  *See English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1008 (10th Cir. 2001); *see also Monroe*, 124 F. Supp. 3d at 1112.  The Tenth Circuit's willingness to infer, on behalf of a plaintiff, that a defendant did not eliminate the position when it terminated a plaintiff for cause is supported by the legal rule that a plaintiff's prima facie burden is *de minimis*.  *Monroe*, 124 F. Supp. 3d at 1112.  Because neither party submitted evidence that Plaintiff's position was eliminated, the court concludes that for the purposes of this order: Plaintiff was not discharged because of a workforce reduction and that his position was not eliminated.  Thus, Plaintiff satisfies the fourth element of the prima facie framework.  Furthermore, because Defendant concedes the first three elements, Plaintiff has met

---

[5] Specifically, the parties agree that *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 644, 140 S. Ct. 1731, 1734, 207 L. Ed. 2d 218 (2020), establishes that a transgender person is protected by Title VII's prohibition against discrimination in employment on the basis of sex. (Docs. 28 and 9-10; 30 at 25.)

his prima facie burden and demonstrated that his termination gives rise to inference of discrimination.

**B.      Defendant shows a legitimate, nondiscriminatory reason for Plaintiff's termination.**

Next, the burden shifts to Defendant to provide a legitimate, nondiscriminatory reason for Plaintiff's termination.  Once again, the parties agree that Defendant meets its burden—Jones had every right to terminate Plaintiff based on his failure to sign the Warning and participate in the interview.  Plaintiff even acknowledged the possibility that he would be fired before refusing to participate.  Therefore, the court concludes Defendant successfully meets its burden, shifting the burden back to Plaintiff to show that Defendant's proffered reason is pretextual.

**C.      Plaintiff raises a genuine issue of fact as to whether Defendant's proffered reason for termination was pretextual.**

The third step in the *McDonnell Douglas* analysis requires a plaintiff to show the employer's reason for discharge was pretextual.  "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th Cir. 2022) (citation omitted).  Plaintiffs must show "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citation omitted).  In the Tenth Circuit, "an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's explanation for the alleged misconduct." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (citation omitted) (brackets omitted).  Furthermore, no specific

type of proof is necessary—rather, courts must examine the totality of the circumstances.  *See Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 598 (10th Cir. 2020).  Thus, the court will consider any:

> (1) evidence that the defendant's stated reason for the adverse employment action was false; (2) evidence that the defendant acted contrary to a written . . . policy prescribing the action to be taken by the defendant under the circumstances; or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's practice] when making the adverse employment decision affecting the plaintiff.

*Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (citation omitted).

Here, Plaintiff relies on the seemingly contradictory circumstances of his termination as evidence that Defendant's decision was pretextual.[6]

During his first interview, Plaintiff clearly indicated that he wished to cooperate in the investigation with counsel present.  Although Plaintiff initially refused to sign the Warning during the June 13 interview—fully aware of the consequences—he also requested the opportunity for another interview.  Defendant, specifically Jones, agreed.  Thus, any difficulty in the investigation caused by Plaintiff's refusal to participate on June 13 would have resolved itself during Plaintiff's subsequent interview on June 16.  Both parties agree that the three-day delay did not hamper the investigation.  Indeed, Plaintiff answered all questions and fully cooperated with the investigation—just not on June 13.  To claim that Plaintiff's failure to answer questions or cooperate in the interview process was the reason for his termination when he cured that failure three days later is somewhat illogical.  Rather, once Plaintiff participated in that second interview,

---

[6] Plaintiff gives multiple reasons for why Defendant's termination of his employment was pretextual.  Because the court concludes that contradictory circumstances surrounding his termination creates a genuine issue of material fact as to whether Defendant reason was pretextual, the court does not analyze Plaintiff's other proffered reasons in this order.  Plaintiff may raise these additional reasons at trial.

any practical basis for his termination based on his refusal to participate in the first interview dissipated.

Furthermore, Jones' proffered reasons for granting the second interview are inconsistent with his subsequent decision.  In his deposition, Jones claimed the investigation was not complete and he wanted to "give [Plaintiff] that grace to come in and allow him to come in and cooperate." First, had Jones wanted to complete the investigation, then it follows that the investigation would have had some result or outcome.  However, Plaintiff never received any discipline for his conduct despite the PSU concluding that Plaintiff violated KHP's policies.  Furthermore, Jones admitted that had the investigation run its normal course, the disciplinary action for Plaintiff's conduct would not have involved termination.  Therefore, the investigation had no real effect. Alternatively, if giving Plaintiff a second chance to cooperate was Jones' true motive for the second interview, then firing Plaintiff for refusing that first interview seems inconsistent with that motive.

It could be that a jury believes Defendant's reason or concludes that Plaintiff's termination, even if pretextual, was not because of his transgender identity.  But the inconsistent reasoning and contradictory circumstances surrounding Plaintiff's termination create genuine issues of material fact as to whether Defendant's reason for termination was pretextual.  Therefore, the court finds that Plaintiff carries his burden under *McDonnell Douglas* for the purposes of this Order. Accordingly, the court denies Defendant's Motion.

### IV.    Conclusion

Therefore, Defendant's Motion for Summary Judgment (Doc. 28) is **DENIED.**

**IT IS SO ORDERED.**

Dated this 19th day of April, 2024.

s/ John Broomes
_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE